UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL BARAKA MASON,

Petitioner,

v.

DANIEL PARAMO, Warden,

Respondent.

Case No.: 16cv1176-JLS-MDD

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PETITION FOR WRIT OF HABEAS CORPUS**

## I. INTRODUCTION

This Report and Recommendation is submitted to United States District Judge Janis L. Sammartino pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

Michael Baraka Mason ("Petitioner"), a state prisoner, seeks federal habeas relief from a felony conviction of three counts of first degree murder (Cal. Penal Code § 187(a)), special circumstances of robbery murder (Cal. Penal Code § 190.2(a)(17)) and multiple murders (Cal. Penal Code § 190.2(a)(3)), one count of attempted murder (Cal. Penal Code §§ 187(a), 664), two counts of attempted robbery (Cal. Penal Code §§ 211, 664), one count of burglary (Cal. Penal Code § 459), five counts of false imprisonment by

violence (Cal. Penal Code §§ 236, 237(a)), one count of assault with a firearm (Cal. Penal Code § 245(a)(2)), two counts of shooting at an inhabited dwelling (Cal. Penal Code § 246), and four counts of possession of a firearm by a felon (former Cal. Penal Code § 12021(a)(1)). (ECF. No. 19-55 at 200-37).[1] After reviewing the Petition (ECF No. 1), Respondent's Answer and Memorandum of Points and Authorities in support thereof ("Answer") (ECF Nos. 30, 30-1), Petitioner's Traverse (ECF No. 33), supporting documents and pertinent state court Lodgments, the Court **RECOMMENDS** the Petition be **DENIED** for the reasons stated below.

## II. <u>FACTUAL BACKGROUND</u>

### A. State Proceedings

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required to "give great deference to the state court's factual findings.")). Accordingly, the following facts are taken from the California Court of Appeal's December 15, 2014, opinion in *People v. Mason*, 232 Cal. App. 4th 355 (2014).

### A. The People's Case

Mason, also known as "Don Diego," is a documented member of the Lincoln Park criminal street gang. Lincoln Park's members have been found responsible for murders and other criminal acts. Mason is an older, more established member of the gang, known as

---

[1] All pincite page references refer to the automatically generated ECF page number, not the page number in the original document.

an "original gangster" or "OG." Other established or OG members of Lincoln Park included Tamoyia Morris, Terrill Bell, and Elliott Perry. In statements to law enforcement, Mason described Morris and Bell as his close friends.

In a gang like Lincoln Park, younger members of the gang are often expected to support older members like Mason. One younger member of Lincoln Park was Z.Z. Jabbar. Z.Z. was a successful drug dealer. He was known for flaunting his wealth, which is called "flossing." Morris, as an established member of Lincoln Park, offered to protect Z.Z. in exchange for part of Z.Z.'s drug revenues. After Z.Z. did not accept Morris's offer, Morris severed his relationship with Z.Z.

Z.Z.'s sister, Hana, lived in a house on Velma Terrace in San Diego. The house was located within the geographic territory of the Lincoln Park gang. Hana's ex-husband purchased the house for her. Police observed Z.Z. coming and going from the house.

At the house, Hana had hoped to run an assisted living home for individuals with mental illnesses. Hana was unable to move the project forward, however, and she found roommates instead. One roommate was Sascha Newbern. Newbern was romantically involved with Meico McGhee, who was Z.Z.'s and Hana's brother. McGhee was also Newbern's pimp. McGhee came to the house often, though he did not live there. Preston and Stacey Adams also lived with Hana and Newbern at the Velma Terrace house.

On November 25, 2005, the day after Thanksgiving, Hana and Preston woke up early and went to work. Sometime afterwards, Stacey awoke to the sound of strange men in the house. When she opened her bedroom door, a man appeared wearing a ski mask and holding a gun. The man tied Stacey's hands and feet, blindfolded her, and asked her where "the money" was. Before she was blindfolded, Stacey observed Newbern tied up as well. At least two men were in the house, and they were speaking via walkie-talkies to at least one other man outside. They were discussing "the money" and using Hana's name.

Preston arrived home in the early afternoon. He was

confronted at the front door by a man with a gun and a bandana or ski mask over his face. Preston was blindfolded, and his hands were tied behind his back. He was led to the room where Stacey was tied up. The men brought Newbern into the room as well. Newbern was crying hysterically. The men threatened to kill her if she did not quiet down.

The men were looking for $500,000, which they believed to be in the house. The men asked Preston and Stacey where the money was; Preston and Stacey were not aware of any money. The men used words typical of Crips criminal street gangs, but Preston and Stacey believed they were trying to hide the fact that they were actually Bloods. At one point, they heard the men slip up and use words commonly associated with Bloods rather than Crips. Lincoln Park is a Bloods gang.

McGhee arrived at the house next. After he arrived, he fought with the men. They beat McGhee savagely and demanded to know where the money was. McGhee said he did not know what they were talking about. After the beating, McGhee's breathing was labored. The men threw McGhee into a bathtub in Preston and Stacey's bathroom.

When Hana came home, one of the men met her soon after she entered the doorway. The man was holding a gun and wearing a mask. Hana later identified this man as Mason after seeing Mason's photograph on the internet.

The men bound Hana's hands and feet. The men told Hana they knew her brother Z.Z. had hidden money in the house. (Z.Z. was incarcerated at that point.) The men threatened to kill her, or hurt the others, if she did not tell them where the money was. They poured gasoline on McGhee and threatened to set him on fire. Hana did not know about any money, but she told them to look in the backyard and in a safe to distract them.

Having failed to find the money, the men told Newbern to get into the bathtub with McGhee. They turned up the television volume very loud. There was at least one gunshot. One of the men said to another that he had to "put in work" too. Then at least one

other shot was fired.  The men fled.  Stacey, Preston, and Hana ran from the house and called for help.

Police arrived and found the house ransacked.  They discovered McGhee and Newbern bound and gagged in the bathtub. McGhee had suffered two gunshot wounds to the head, one of which had passed through his brain.  McGhee also had numerous bruises and lacerations on his head and chemical burns on his body.  The chemical burns could have been caused by exposure to gasoline.  Newbern suffered a single gunshot wound to the head.  She also had chemical burns on her buttocks.  Both victims' gunshot wounds were fatal.  Three bullet casings were found at the scene.  Forensic analysis revealed that they were likely fired from the same gun.

In the bathroom, police found three cigarette butts, a tampon, and a piece of wax paper in a toilet.  Police observed urine in the toilet, which Preston had flushed before he went to work that day. DNA analysis of the cigarette butts revealed that one matched Newbern's DNA.  Another cigarette butt matched Mason's DNA. The probability that a random man in the African-American population would match the DNA found on that cigarette butt is 1 in 2.1 sextillion individuals.  (Mason is African-American.)  The cigarettes appeared to have been deposited in the toilet around the same time.  Police also found a blood stain on the bathroom door. Later analysis of the stain revealed that it contained a mixture of DNA from McGhee and DNA from Tamoyia Morris.

Although they did not have Hana's witness identification or the DNA analysis identifying Mason at the time, police suspected that Mason was involved in the shootings.  Mason's photograph was posted on a Crime Stoppers Web site, and he was identified twice on the television show "America's Most Wanted."  Later, Marquis Veal, a Lincoln Park gang member, told police about a conversation he had with Terrill Bell.  In that conversation, Bell admitted taking part in the Velma Terrace shootings and said that Mason, Morris, and Perry were involved as well.

Twenty months after the Velma Terrace shootings, Nagar Safavi and Timothy Traaen were out celebrating their anniversary in the area of Adams Avenue and 30th Street in San Diego.  They

parked on Suncrest Drive and went to a nearby bar to meet friends. They left the bar around midnight and walked to their car. Traaen opened the car door. As they talked, a man approached and pointed a gun at them. He demanded money. Traaen tried to reason with the man, but after a few minutes Safavi emptied the contents of her purse on the car seat. The man grabbed some items and then fired several shots at Safavi and Traaen.

Traaen was struck three times and died from his wounds. Safavi suffered a gunshot wound to her chest, but she survived. Safavi described the shooter as an African-American male with a flat nose and full lips. He was wearing a hooded sweatshirt that partially covered his face. While viewing a lineup that included Mason, Safavi could not identify the shooter.

Witnesses observed a man with a gun running down an alleyway, where an older full-sized Chevy van was parked. One witness heard both a male and female voice. The man told the woman to "[h]urry up, get in the van." The van drove away, in reverse, with its lights off. In the alleyway, police investigators recovered a cigarette butt in very good condition. DNA recovered from the cigarette butt matched the DNA of a woman named Jessica Jones.

Jones had purchased an older, full-sized Chevy van the month before in Las Vegas, Nevada. Jones was accompanied by a muscular African-American man with a tattooed arm. Witnesses identified it as the same van leaving the alleyway near Suncrest Drive.

Three weeks after the Suncrest shootings, witnesses observed a similar van involved in a drive-by shooting on Capistrano Avenue in Spring Valley, an unincorporated area in San Diego County. An African-American man in the van fired shots at several other African-American men who were gathered near the street. The men returned fire. A bullet was recovered from a nearby house where Perry lived with his family. The bullet was fired from the same gun that was used in the Suncrest shootings. Other bullets, fired from another gun, were recovered in the area.

A witness identified one of the men near the street as Tamoyia Morris. Earlier, Morris's mother had contacted police and reported that Morris had been threatened by Mason, whom she identified as "Lon Don." Mason left a note on Morris's car threatening to kill him for being a "snitch." Morris's mother spoke to police a week later to report that Morris had received threatening voice mail messages from Mason. In the messages, Mason demanded money because he was on the run from police.

The next day, police responded to a report that shots had been fired at Morris's house as well. Morris and his grandmother, who also lived there, denied that any shots had been fired recently. However, police reinvestigated the shooting almost a year later and found three bullets in the stucco walls of the house, which was located on Keeler Street. These bullets were fired from the same gun that was used in the Suncrest and Capistrano shootings.

Later, Jessica Jones was contacted by police investigating a potential domestic disturbance at the Padre Gardens apartment complex in San Diego. Police received a report of an argument between a male and a female there. Police knocked on the door of the apartment, but there was no answer. Police noticed the van Jones had purchased parked outside the apartment. It took police several minutes to get a key from the apartment management. When police entered the apartment, they spoke with Jones. They did not find any other person in the apartment. In a later interview with law enforcement, Mason admitted staying at the apartment with Jones. He said he hid underneath a pile of clothes when the police arrived.

Other members of law enforcement continued to search for Mason, who also had an outstanding warrant for parole violations. One night, in the hopes of finding Mason, police surveilled a parking lot at a shopping center in the College Grove area of San Diego. They identified a dark green Nissan Altima, which met a white sport utility vehicle in the lot. The Nissan exited the parking lot, and police followed. At one point, a police detective in an unmarked car found himself in front of the Nissan. The Nissan pulled up alongside the police car, and the police detective believed the Nissan's passenger looked very similar to Mason. The detective

and other marked patrol cars followed the Nissan. The Nissan drove to an apartment complex and crashed into a building. The individuals in the car fled. The police detective followed the passenger who looked similar to Mason, but he escaped through nearby woods. In the woods, along the passenger's path, police found a gun that appeared to have been freshly dropped there.

Forensic analysis revealed that the gun police recovered had been used in the Suncrest shootings which killed Traaen and injured Safavi, as well as the drive-by shootings at Capistrano and Keeler. Analysis of DNA found on the gun revealed a mixture of DNA from at least two individuals. Mason was very likely a contributor to the DNA mixture found on the gun. Mason's DNA types were the strongest of the types in the mixture.

Mason contacted an acquaintance, Veronica Patton, and asked her to help him buy two vehicles, one of which was for Jones. Patton also assisted Mason in renting a house in Las Vegas for him and Jones. In Las Vegas, Mason was stopped for a routine traffic violation. After stopping, Mason sped away from police. The police gave chase, but they had to fall back because Mason's driving was creating a dangerous situation. The police, assisted by a helicopter, tracked Mason's position. Mason and a passenger eventually fled on foot. An officer, also on foot, caught up with Mason in a Las Vegas backyard. As the officer tried to apprehend him, Mason swung a pipe at the officer. After a struggle with two officers, during which Mason was hit with a Taser several times, Mason was taken into custody. The passenger, a 17-year-old female, was found in a nearby pizza restaurant and arrested as well. While in custody, Mason gave a false name to Las Vegas police.

In their subsequent investigation, Jones led police to the Chevy van, which was at an abandoned car upholstery shop. Police identified a bullet hole on the inside of the van. Police recovered a bullet, which matched the unidentified bullets recovered from the scene of the Capistrano drive-by shooting. The bullets appeared to have been fired by one of the targets of the shooting.

Police uncovered a number of letters and other documents written by Mason. One letter chides Jones for speaking with police.

It asked her, "What happen[ed] to you just sayin[g] I want my lawyer!!?" Another letter expressed dismay that police had recovered the van "in the condition it was left in!!" A document recovered from Mason's jail cell appeared to contain rap lyrics about a home invasion robbery stemming from a gang member's failure to support other members of the gang.

### B. The Defense Case

At trial, Mason's defense disputed the various eyewitness identifications as unreliable and contradictory. It also attacked the credibility of the statements Marquis Veal made to police. A Lincoln Park member, Desavian Powell, testified that Mason was a well-respected musical artist and the member of a rap group called the "Cherry Chuck Gang." The Cherry Chuck Gang wanted to fix up the Chevy van and use it for their tours. The owner of the car upholstery shop testified that Darryl Charles, another Lincoln Park member and a member of the Cherry Chuck Gang, brought the van in for upgrades. When the business failed, however, the owner left the van parked on his lot.

Powell said the van could be started without keys and numerous people drove it. Another defense witness, Tyrone Simmons, also a Lincoln Park member, testified that he lived in the Padre Gardens apartment and was romantically involved with Jessica Jones. He denied that Mason ever stayed at the apartment.

*Mason*, 232 Cal. App. 4th at 358-64 (footnotes omitted).

On November 7, 2012, a jury convicted Petitioner of: (1) three counts of first degree murder and found true the special circumstances of robbery-murder and multiple murders as to each; (2) one count of attempted murder; (3) two counts of attempted robbery; (4) one count of burglary; (5) five counts of false imprisonment by violence; (6) one count of assault with a firearm; (7) two counts of shooting at an inhabited dwelling; and (8) four counts of possession of a firearm by a felon. (ECF. No. 19-55 at 200-37). The jury also found true several gang and firearms-related sentencing enhancements.

(*Id.*).  Petitioner also admitted two prior serious felony convictions and three prior strikes.  (*Id.*).  On April 4, 2013, the trial court sentenced Petitioner to nine consecutive terms of life imprisonment without the possibility of parole, an indeterminate term of 337 years and six months to life imprisonment, plus an additional 110 years. (ECF. Nos. 19-56 at 281-82; 19-49 at 30-31).

On April 11, 2013, Petitioner filed a Notice of Appeal. (ECF. No. 19-56 at 282).  Petitioner argued: (1) the trial court erroneously admitted the prior testimony of Hana Jabbar; (2) the trial court erroneously admitted the out-of-court statements of informant Marquis Veal recounting statements made by Petitioner's accomplice; (3) the evidence does not support Petitioner's multiple convictions for possession of the same firearm on different days because that crime is a single, continuous offense; and (4) the life imprisonment without parole sentences should not have been tripled under the Three Strikes law.  (ECF. Nos. 19-59 at 42-89; 19-62 at 3).  The state appellate court reversed all but one of Petitioner's possession of a firearm convictions, modified the judgment to reflect a total of three life sentences without the possibility of parole, and affirmed the judgment in all other respects.  (ECF. No. 19-62 at 13-30).

On January 14, 2015, Petitioner filed a petition for review in the California Supreme Court, arguing the trial court erroneously: (1) admitted the prior testimony of Hana Jabbar; and (2) admitted the out-of-court statements of informant Marquis Veal recounting statements made by Petitioner's accomplice.  (ECF. No. 19-63 at 8-29).  On March 11, 2015, the California Supreme Court denied the Petition.  (ECF. No. 19-64).

## B.  Federal Proceedings

On May 11, 2016, Petitioner constructively filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this district.  (ECF No. 1).

Petitioner raised two claims: (1) the trial court erred in admitting the preliminary hearing testimony of Hana Jabbar at trial; and (2) Petitioner received ineffective assistance of counsel when his attorney failed to challenge the trial court's decision permitting the guilty verdict to stand and the case to proceed to sentencing when Juror 4 expressed she had reasonable doubt after the verdict was given. (*Id.* at 12-13).

On October 25, 2016, Respondent filed a Motion to Dismiss the Petition, a Memorandum of Points and Authorities, and lodgments. (ECF Nos. 18, 19). The Court granted Respondent's Motion to Dismiss in part, dismissing claim two. (ECF No. 28). On August 10, 2017, Respondent answered the Petition as to claim one. (ECF No. 30). On October 27, 2017, Petitioner filed a Traverse. (ECF No. 33).

## III. STANDARD OF REVIEW

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh*, 521 U.S. 320. Title 28, U.S.C. § 2254(a) provides the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early*

*v. Packer*, 537 U.S. 3, 7-8 (2002).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . . ." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court's decision may be "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Id*. at 405-06. A state court decision does not have to demonstrate an awareness of clearly established Supreme Court precedent, provided neither the reasoning nor the result of the state court decision contradict such precedent. *Early*, 537 U.S. at 8.

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. An unreasonable application may also be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S.Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). An

unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). Instead, the state court's application must be "objectively unreasonable." *Id.* at 76; *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Even if a petitioner can satisfy § 2254(d), the petitioner must still demonstrate a constitutional violation. *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007).

Federal courts review the last reasoned decision from the state courts. *See Ylst. v. Nunnemaker*, 501 U.S. 797, 805-06 (1991); *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). The petitioner must establish that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement . . . ." *Burt v. Titlow*, 134 S.Ct. 10, 16 (2013) (citation omitted). It is not within a federal habeas court's province "to reexamine state court determinations on state-law questions . . . ." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

## IV. **DISCUSSION**

### A. Claim 1: Admitting the Preliminary Hearing Testimony of Hana Jabbar at Trial

#### 1. State Court Opinion

Petitioner presented this claim to the state appellate and supreme courts on direct review. (ECF. Nos. 19-59; 19-63). The appellate court denied

Petitioner's claim on the merits. (ECF No. 19-62 at 18). The California Supreme Court denied the petition without comment or citation to authority. (ECF. No. 19-64). Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for authority. *Ylst*, 501 U.S. 805-06. That court wrote:

> Hana did not testify live at trial. Instead, her preliminary hearing testimony was admitted as the prior testimony of an unavailable witness. (Evid. Code, § 1291.) To establish Hana's unavailability, the prosecution offered the testimony of William Cahill, an investigator employed by the prosecution. Cahill spent approximately 18 years as a detective with the San Diego Police Department. Outside the presence of the jury, Cahill testified that he had been in contact with Hana prior to the trial of Tamoyia Morris, who was also charged in connection with the Velma Terrace shootings. Hana was very cooperative until just prior to the start of Morris's trial. Cahill continued to try to contact her, but he was unable to do so. Cahill's efforts included calls, e-mails, and text messages to Hana; discussions with Hana's ex-husband and boyfriend; and visits to places where Hana had lived. Cahill also placed Hana's name in an "Officer Notification System." Cahill was unable to reach her.

> Hana contacted Cahill after Morris's trial to ask about the outcome. Cahill spoke with Hana and told her he would need to subpoena her for Mason's trial, which was upcoming. Hana said she would be in contact with Cahill. When she was not, Cahill tried to contact Hana again. He used the same methods he had used before. Cahill texted or e-mailed Hana, but he received no response. Cahill spoke with Hana's ex-husband, but he said Hana was living on the streets in the East Village area of downtown San Diego. Cahill drove through that area several times, spoke with homeless people there, and showed them Hana's picture. Cahill also spoke with Z.Z. and Hana's now-former boyfriend. Cahill reviewed a police database that would list any contacts Hana had with police or emergency personnel, but there were no results. On cross-examination, Cahill was asked whether he had attempted to triangulate Hana's location through her cell phone. Cahill replied

16cv1176-JLS-MDD

he had not.

Based on Cahill's testimony, the trial court found that Hana was unavailable as a witness within the meaning of Evidence Code section 240, subdivision (a)(4) and (5). The court stated, "I think under either one or both of these provisions, the preponderance of the evidence establishes her unavailability, which satisfies that foundational requirement for the use of her prior testimony."

Mason contends the court erred in finding Hana unavailable. Evidence Code section 240, subdivision (a)(4), provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process." The Attorney General does not argue that Hana was unavailable within the meaning of that subdivision. Instead, the Attorney General relies on Evidence Code section 240, subdivision (a)(5), which provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." Mason counters that the prosecution did not exercise reasonable diligence in securing Hana's attendance at his trial and thus cannot establish her unavailability under this subdivision.

"The term 'reasonable diligence' or 'due diligence' under Evidence Code section 240, subdivision (a)(5) ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citations.]" ' [Citation.] Considerations relevant to this inquiry include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored." (*People v. Wilson* (2005) 36 Cal.4th 309, 341.)

" 'What constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case.' " " 'The totality of efforts of the proponent to achieve presence of the witness must be considered by the court.' " (*People v. Sanders* (1995) 11 Cal.4th 475, 523.) The proponent of an unavailable witness's testimony must undertake good faith efforts that are reasonable under the circumstances to obtain the witness's presence at trial.

(*People v. Herrera* (2010) 49 Cal.4th 613, 622-623 (*Herrera*).)

" 'That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence] . . . . It is enough that the People used reasonable efforts to locate the witness.' [Citation.] A court cannot 'properly impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply "disappear," long before a trial date is set.' " (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

The proponent of the witness has the burden of showing the witness is unavailable. (*People v. Valencia* (2008) 43 Cal.4th 268, 292.) "We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera*, *supra*, 49 Cal.4th at p. 623.)

Here, the facts surrounding the prosecution's efforts to secure Hana's attendance at trial are essentially undisputed. Cahill, the prosecution's investigator, spoke with Hana prior to Mason's trial and told her her testimony would be required. Later, Cahill attempted to contact Hana by cell phone, but she did not respond. Cahill spoke with the people closest to Hana about her whereabouts and determined she was homeless. Cahill went to the area where she was reportedly staying and showed her picture to other homeless people in an effort to find her. Cahill himself drove through the area multiple times looking for her. Cahill also reviewed a database of contacts with law enforcement and emergency personnel and found no mention of Hana.

Although Hana's eyewitness testimony and identification of Mason were important evidence at Mason's trial, we conclude the prosecution's efforts to secure her attendance were reasonable under the circumstances. (See *People v. Sanders*, *supra*, 11 Cal.4th at p. 523.) Based on Cahill's investigation, even Hana's closest

friends were not in contact with her and did not know her location. Cahill nonetheless determined the area of San Diego in which she was believed to be living. With that information, Cahill undertook substantial efforts to try to find her. Mason suggests that Cahill could have visited homeless shelters and spoken to aid agencies in the area about Hana. While those actions may have been helpful, it was not unreasonable for the prosecution to rely on Cahill's direct contact with homeless people and his own search of the streets in the area.

Mason points out that Hana failed to appear at the earlier Morris trial. He contends the prosecution should have secured a material witness warrant for her arrest. (See § 1332.) After Morris's trial, however, Hana reached out to Cahill to inquire about the results. When Cahill told her she would have to testify at Mason's trial, she did not explicitly resist. Hana said she would contact Cahill when the trial was closer, and Cahill continued to have her cell phone contact information. Under these circumstances, the prosecution's failure to obtain a material witness warrant was not unreasonable. "To have a material witness who has committed no crime taken into custody, for the sole purpose of ensuring the witness's appearance at a trial, is a measure so drastic that it should be used sparingly." (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.) Mason has not shown that such a drastic measure was required here.

Mason also suggests that the prosecution was required to use Hana's cell phone to locate her, either through billing records or electronic tracking. Since Hana was homeless, however, her billing records would not have reflected her residence. While some evidence of her location may have been obtained from her payment information, or through electronic tracking, the prosecution was not required to undertake every possible effort to locate Hana. The prosecution's actions show good faith and reasonable efforts under the circumstances here. (See *Herrera*, *supra*, 49 Cal.4th at pp. 622-623.) " 'That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness.' " (*People v. Wilson*, *supra*, 36 Cal.4th at p. 343.)

16cv1176-JLS-MDD

We conclude the trial court did not err in finding Hana unavailable under Evidence Code section 240, subdivision (a)(5), and admitting her preliminary hearing testimony. Because the trial court did not err, we need not consider Mason's arguments regarding prejudice.

(ECF No. 19-62 at 13-18) (footnotes omitted).

### 2. Summary of Arguments

Petitioner argues that the appellate court "unreasonably found that the prosecution's limited efforts to locate Jabbar, despite its knowledge that she was unlikely to appear at trial, demonstrated a good faith effort." (ECF No. 33 at 7). Specifically, Petitioner contends that the appellate court "disregarded reasonable affirmative measures that the government could have taken to obtain Jabbar's presence at trial." (*Id.*). Additionally, Petitioner claims that the error had a substantial and injurious effect or influence in determining the jury's verdict because "Hana Jabbar was the *only* eyewitness who identified Mr. Mason as committing any of the charged crimes, and the prosecution relied heavily on her out-of-court testimony in its closing argument." (ECF No. 33 at 9-10).

Respondent argues that the appellate court reasonably concluded that there was no error in finding Jabbar unavailable and that the prosecution's actions showed good faith and reasonable efforts to locate Jabbar. (ECF No. 30 at 19-22). Respondent contends that the prosecution satisfied its obligation of good faith and due diligence in establishing Jabbar's unavailability. (*Id.* at 22). Respondent further contends that any error in admitting Jabbar's testimony was harmless because there was ample evidence that Petitioner participated in the crimes at Velma Terrace. (*Id.* at 21).

///

### 3. Legal Standard

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). This rule applies to prior testimony given at preliminary hearings. *Id.* The United States Supreme Court has held that "a witness is not 'unavailable' for purposes of the [unavailability] exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v.* Page, 390 U.S. 719, 724-25 (1968). The prosecution must exercise reasonable diligence to secure the witness's presence at trial, but it need not take every conceivable measure to secure a witness appearance. *Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir. 1998) (citing *Barber*, 390 U.S. at 724-25). It is the prosecution's burden to demonstrate that it took reasonable steps to secure a witness's presence at trial. *Ohio v. Roberts*, 448 U.S. 56, 74 (1980). A federal habeas court may not overturn a state court's decision on the question of unavailability merely because additional steps might have been taken to make the witness available. *Hardy v.* Cross, 565 U.S. 65, 72 (2011).

Even if the trial court erred, habeas relief is only warranted if the error is not harmless. An error is not harmless if it has a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In determining whether an alleged error is harmless, the reviewing court must examine "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Wade*

16cv1176-JLS-MDD

*v. Calderon*, 29 F.3d 1312, 1322 (9th Cir. 1994), overruled on other grounds by *Rohan ex rel Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2003). The Supreme Court has further clarified that "[t]he inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

### 4. Analysis

Here, the California Court of Appeal's conclusion that the prosecution made good faith, diligent efforts to locate Jabbar was neither contrary to, nor an objectively unreasonable application of, clearly established Supreme Court law.

After Jabbar stopped cooperating with Cahill, he made several efforts to locate her. He attempted to contact her by phone and e-mail and he spoke to people close to her. When he learned Jabbar was homeless in the East Village neighborhood, he searched the area. The prosecution undertook timely and serious efforts to locate Jabbar and diligently pursued possible leads. While Petitioner suggests additional methods to locate Jabbar, the prosecution is not required to exhaust every possible action to secure a witness for trial. Here, the steps the prosecution took to locate Jabbar were sufficient. Thus, the Court of Appeal's conclusion that the prosecution made good faith, diligent efforts to locate Jabbar was neither contrary to, nor an objectively unreasonable application of, clearly established Supreme Court law.

Even if the trial court erred in allowing Jabbar's preliminary hearing testimony, the error did not have a substantial and injurious effect or influence on the jury's verdict. Petitioner's DNA was found on a cigarette

butt in the bathroom at the Velma Terrace crime scene.  Veal told police that in a conversation with Bell, Bell admitted taking part in the Velma Terrace shootings and said Petitioner was involved as well.  Petitioner's photo was posted on a Crime Stoppers web site and he was identified twice on the television show "America's Most Wanted."  The ample evidence against Petitioner was not entirely centered on Jabbar's testimony.  This Court is not in grave doubt about whether any error in admission of Jabbar's testimony prejudiced Petitioner.

Accordingly, the Court **RECOMMENDS** that Petitioner's claim be **DENIED**.

## V.  <u>CONCLUSION</u>

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that no later than **<u>April 13, 2018</u>**, any party to this action may file written objections with this Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

///
///
///
///
///
///
///
///

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **April 20, 2018**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appear of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated:   March 14, 2018

Hon. Mitchell D. Dembin
United States Magistrate Judge

16cv1176-JLS-MDD